[Cite as *Tobin v. Univ. Hosp. E.*, 2015-Ohio-3903.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

James Tobin, Administrator [of the Estate       :
of Bruce Tobin, deceased],

                                                :
          Plaintiff-Appellant,

                                                :          No. 15AP-153
v.                                                       (Ct. of Cl. No. 2012-08494)

                                                :
University Hospital East,                                  (REGULAR CALENDAR)

                                                :
          Defendant-Appellee.

                                                :

D E C I S I O N

Rendered on September 24, 2015

*James Tobin*, pro se.

*Michael DeWine*, Attorney General, and *Daniel R. Forsythe*, for appellee.

APPEAL from the Court of Claims of Ohio

TYACK, J.

{¶ 1} Plaintiff-appellant, James Tobin, administrator of the estate of his son Bruce Tobin ("Bruce"), appeals from the February 9, 2015 judgment of the Court of Claims of Ohio in favor of defendant-appellee, University Hospital East ("Hospital"), for the alleged wrongful death of Bruce as a result of the care he received from Nurse Wendy Morton at the Hospital in November of 2005. For the reasons that follow, we affirm the judgment of the trial court.

**FACTUAL BACKGROUND**

{¶ 2} Bruce was 48 years old at the time he was admitted to the Hospital in November of 2005. In 1996, he had been diagnosed at the Ohio State University Sleep Medicine Clinic with severe obstructive sleep apnea. He was prescribed the use of a

Continuous Positive Airway Pressure ("CPAP") machine, and he acquired it and used it to maintain his open respiratory airway when sleeping.

{¶ 3} On November 15, 2005, Bruce's wife took him to the Hospital emergency room because he was experiencing severe pain. Because of the severity of his pain, he was unable to complete a patient database about his medical history. Later that evening, Bruce had a conversation on the phone with his wife, who reminded him about his CPAP machine. Bruce responded, "[T]hey're a hospital, they should have one here." (Tr. 241.) However, Bruce never told any hospital employees that he had sleep apnea, or that he needed a CPAP machine, and one was never provided to him.

{¶ 4} In the emergency room, Bruce was given pain medication, but his pain remained severe. The decision was made to admit him to the Hospital for further testing the next day to determine the cause of his pain. Rohit Kashyap, M.D. ordered 1 to 2 milligrams of Dilaudid pushed intravenously no more than every 2 hours for pain and 12.5 milligrams of Phenergan for nausea.

{¶ 5} Bruce arrived on the fifth floor of the Hospital at approximately 3:00 a.m., at which time he came under the care of Nurse Morton. As part of her head-to-toe assessment, she gave him a nursing database form to fill out. Because of pain, he only completed a few lines. He did not tell anyone he had sleep apnea or that he needed a CPAP machine. He rated his pain at eight out of ten, which is considered severe pain. Nurse Morton administered 2 milligrams of Dilaudid at 3:35 a.m. She returned to check on him numerous times and charted his sedation level each time as being awake and alert.

{¶ 6} At 5:00 a.m., Bruce complained of nausea. Nurse Morton gave him the prescribed dose of Phenergan at 5:10 a.m. and checked on him at 5:30 a.m. At that time, he rated his pain as a three out of ten. At 6:10 a.m., Bruce reported the pain was returning. It was less severe, however, and he rated it a five out of ten. Nurse Morton repeated the 2 milligram dose of Dilaudid. When she returned at 6:45 a.m. to check on him, Bruce was comfortable, and for the first time since arriving on the floor, he was lying back on his bed. He rated his pain at that time as a one out of ten.

{¶ 7} Nurse Morton returned at approximately 7:10 a.m. and found Bruce unresponsive. She called a Code Blue. The emergency team was able to resuscitate him,

but he died several days later.  The autopsy report stated that the anatomic cause for the spontaneous cardiopulmonary arrest could not be identified.

**PROCEDURAL BACKGROUND**

{¶ 8}   Bruce's wife, Jennifer, the prior administrator of the estate, filed a lawsuit in the Court of Claims against University Hospital East in November of 2007.  The lawsuit was essentially stayed for four years while a connected action took place in the Franklin County Court of Common Pleas against Rohit Kashyap, M.D., a private hospitalist who cared for Bruce as discussed above.  Eventually, Mrs. Tobin voluntarily dismissed the action in the Court of Claims.  Appellant then became the administrator of the estate and filed the current lawsuit in November of 2012.

{¶ 9}   After extensive discovery and certain stipulations, the matter came to trial. The issue for trial was whether Nurse Morton negligently caused Bruce's death.  After a four-day trial, the Court of Claims granted judgment in favor of the Hospital.  The trial court reviewed the evidence and the testimony of expert witnesses for both sides.  The trial court found that the Hospital, through its nurse Wendy Morton, did not breach the duty of care owed to Bruce and that appellant had failed to prove his claim by a preponderance of the evidence.

**ASSIGNMENT OF ERROR**

{¶ 10}  Appellant, proceeding pro se, has assigned the following as error:

> The trial Court erred in failing to find that Defendant OSU Hospital East and its Nurse, Wendy Morton, were negligent as noted below and the [sic] such negligence was the proximate cause of the death of Patient, Bruce Tobin in the following respects:
>
> 1) Defendants failed to apply and monitor continuously oxygenation to the Patient as ordered by the Admitting Hospitalist, Rohit Kashyap, M.D.
>
> 2) An acceptable and necessary history of [Bruce's] past medical care and current medical history WAS not obtained by Nurse Wendy Morton and the other nursing staff on the floor.
>
> 3) [Bruce] received too much pain medication.  The Nursing staff failed to consider and suggest other non-narcotic

pharmacological modalities for pain control. From the time [Bruce] was presented to the floor at T5, he ceived [sic] pain meds with no real assessment of opiod [sic] tolerance by the nursing staff.

4) [Bruce's] vital signs were never fully and regularly monitored. Patient monitoring and documentation of [Bruce] was unacceptable. Standards require that blood pressure, pulse, respirations, and oxygen saturation will be documented on all patients after IV administration of analgesics and administration of medications that my [sic] alter vital signs, but these vital signs were never monitored nor documented. There is no indication that pupils were ever assessed, and pupil dilation/fixation is the best and most sensitive indicator of early sedation overdose syndrome. Pulse oximetry should have been on; pulse oximetry did not require a physician order.

5) The synergistic effects of the opioid pain medications administered to [Bruce] by the nursing staff at the Hospital were magnified by other medications [Bruce] took before he presented to the Hospital, as well as medications he received while in the [sic] nursing staff at OSU, including Phenergan, Seroquel, and Depakote, a factor which was not considered by the nursing staff.

6. Dilaudid was ordered by the physician for severe pain. The nursing staff breached the standard of care by giving medication for a pain rated less than severe.

7. [T]he nursing staff did not follow the nursing process. The nursing staff breached the standard of care for assessment and reassessment of patients receiving narcotic assessments.

8. These respective breaches of care were the proximate cause of the injury and death of Bruce Tobin.

## MANIFEST WEIGHT OF THE EVIDENCE

{¶ 11} In his assignment of error, appellant argues that the trial court's judgment in favor of the Hospital was against the manifest weight of the evidence. Appellant draws his arguments almost verbatim from the supplemental report of one of appellant's experts, Michelle M. Glower, R.N. Nurse Glower testified at trial that Hospital nursing

staff, and specifically Nurse Wendy Morton, breached the standard of care with respect to Bruce.

{¶ 12} In *Yurkowski v. Univ. of Cincinnati*, 10th Dist. No. 11AP-974, 2013-Ohio-242, ¶ 41, quoting *Osgood v. Dzikowski*, 10th Dist. No. 08AP-105, 2008-Ohio-5065, ¶ 15-16, this court set forth the standard of review to be applied in a civil professional malpractice case in assessing whether a trial court's judgment is against the manifest weight of the evidence:

> "[W]here an appellant challenges a trial court's judgment in a civil action as being against the manifest weight of the evidence, the function of the appellate court is limited to an examination of the record to determine if there is any competent, credible evidence to support the underlying judgment." *Lee v. Mendel* (Aug. 24, 1999), Franklin App. No. 98AP–1404, 1999 Ohio App. LEXIS 3892, at *14, 1999 WL 638645 [at *6]. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.
>
> "A trial court's findings of fact are presumed to be correct and will not be reversed as being contrary to the manifest weight of the evidence if there is competent and credible evidence supporting the finding." *Eagle Land Title Agency v. Affiliated Mtge. Co.* (June 27, 1996), Franklin App. No. 95APG12–1617, 1996 Ohio App. LEXIS 2766, at *5, 1996 WL 362051 [at *2] citing *Wisintainer v. Elcen Power Strut Co.* (1993), 67 Ohio St.3d 352, 355, 617 N.E.2d 1136. "Further, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to decide." *Eagle Land Title Agency* [at *2]; see, also, *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24, citing *Seasons Coal*, supra, at 80–81, 461 N.E.2d 1273. "This presumption arises because the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Wilson*, supra, at 387, 865 N.E.2d 1264, quoting *Seasons Coal*, supra, at 80, 461 N.E.2d 1273. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. *Id.*

{¶ 13} "[I]n a medical malpractice case, 'whether the defendant has employed the requisite care must be determined from the testimony of experts' and, therefore it is within the province of the trier of fact to weigh the medical testimony and to resolve the conflicting opinions." *Yurkowski v. Univ. of* Cincinnati, 10th Dist. No. 13AP-1049, 2015-Ohio-1511, ¶ 15, quoting *Lips v. Univ. of Cincinnati College of Medicine*, 10th Dist. No. 12AP-374, 2013-Ohio-1205, ¶ 51, quoting *Gordon v. Ohio State Univ.,* 1oth Dist. No. 10AP-1058, 2011-Ohio-5957, ¶ 77.

{¶ 14} In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained. *Stanley v. Ohio State Univ. Med. Ctr.,* 10th Dist. No. 12AP-999, 2013-Ohio-5140, ¶ 19 (10th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976).

{¶ 15} With these standards in mind, we proceed to address appellant's eight sub-arguments that the trial court's judgment was against the manifest weight of the evidence.

**Failure to Apply and Monitor Oxygenation**

{¶ 16} Appellant argues that Dr. Kashyap expressly ordered continuous supplemental oxygen for Bruce and that Nurse Morton breached the standard of care when she failed to put Bruce on oxygen support and monitoring.

{¶ 17} Dr. Kashyap testified that he ordered supplemental oxygen as a standard order for anyone for whom he was the admitting physician. (Kashyap Depo., 65.) Nurse Morton addressed the protocol for supplemental oxygen during her testimony:

> Q. Let's take a look again at the orders. I'm going back to page 33, tab 4, Joint Exhibit 8. Now I am going to show you the order No. 4 I think it is, excuse me, No. 6. I'm sorry. Do you see it?
>
> A. I do.
>
> Q. And it's headed Supplemental O2 CONT. What is CO—what does that mean?
>
> A. Continuous.

Q.  Okay.  And then what does it say - - down at the bottom it says titrate per protocol?

A.  That's correct.

Q.  Okay.  What does that mean?

A.  That means to titrate it per our policy and protocol.  Our protocol was to add oxygen to a patient if they had oxygen saturation below 92 percent.

Q.  And if you take a look at the paper document you have there on your flow sheet, are the vitals recorded for [Bruce] at 3:00 in the morning?

A.  They are.

Q. And does it indicate what his O2 – oxygen blood saturation level was?

A. His oxygen saturation was 97 percent.

Q.  Was that with any supplemental oxygen?

A.  No.  He was on room air, no assistance in oxygenation.

Q.  So according to the protocol, was additional oxygen required at that point?

A.  No.

Q. So was that order complied with to your understanding?

A.  It was.

(Tr. 118-19.)

{¶ 18} Thus, there was competent and credible evidence in the trial record to support the finding that Nurse Morton did not breach the standard of care by utilizing the Hospital protocol as to when to provide supplemental oxygen for Bruce.

**Failure to Obtain a Medical History**

{¶ 19} Appellant argues that Nurse Morton failed to obtain an acceptable history of Bruce's past medical care.  According to appellant's expert, Michelle M. Glower, R.N., a

check of past records is standard operating procedure and would have revealed Bruce's severe obstructive sleep apnea.

{¶ 20} The Hospital's witnesses countered this opinion in numerous places in the transcript. For example, defense expert witness Mary Jane Martin Smith, R.N., testified that it was acceptable for Nurse Morton to rely on the medical histories obtained by the emergency room physician and the admitting physician and that the standard of care does not require Nurse Morton to retrieve old medical records. (Tr. 750.)

{¶ 21} Even appellant's expert, Rolf Holle, M.D., testified that, when a physician makes an order in a hospital for a drug that will be executed by nurses, he understands that nurses are relying on his understanding of the drug and his having obtained an appropriate history before prescribing it. He further noted that the patient might have an unexpected reaction to the medication, so they trust the nurse to monitor the patient. (Tr. 390-91.)

{¶ 22} According to Nurse Smith, Nurse Morton was not required by the standard of care to ask Bruce if he had sleep apnea or used a CPAP machine. Nurse Smith based her opinion on the fact that Bruce "was presenting with abdominal pain and his respiratory parameters were normal. He had a good oxygen saturation and normal respiratory rate and he had no complaints relating to the respiratory system." (Tr. 751.)

{¶ 23} Additionally, Kathryn Mitzel, D.O., the attending physician in the emergency room, testified that she worked with emergency room nurses every day and that, while they are expected to ask patients about their medical history, they are not expected to check prior medical charts. (Mitzel Depo. 64-65.)

{¶ 24} Nurse Glower also testified that sometimes patients are not able to comply with filling out paperwork because they are in too much pain. (Tr. 563.) She also stated that she had "no problem" with the Hospital's policy that the patient database form should be filled out within the first 24 hours of an admission. (Tr. 563.) As appellant's expert, she also agreed that a nurse can rely on the emergency department records and history and the attending physician's records of the patient's history. (Tr. 573-74.)

{¶ 25} Thus, there was competent, credible evidence in the record that Nurse Morton was not required to access old medical records, and that she was entitled to rely upon the history taken in the emergency room and by the attending physician. Further,

her decision to postpone completion of the patient database did not breach the standard of care.

**Bruce Received Too Much Pain Medication**

{¶ 26} Appellant argues that, according to Nurse Glower, the nursing staff failed to consider non-narcotic modalities of pain control and that he received pain medication with "no real assessment of opioid tolerance by the nursing staff." (Appellant's Exhibit 40.)

{¶ 27} This expert opinion was countered by evidence that, on at least one occasion, Nurse Morton used distraction and/or repositioning as a method of pain control and that, no fewer than seven times between 3:00 a.m. and 6:45 a.m., she checked on and assessed Bruce while he was on the floor. (Tr. 627; Joint Exhibit 8, Tab 4.) Each time she checked on Bruce, he was alert and his sedation level was zero. (Tr. 629.)

{¶ 28} Additionally, the Hospital offered the testimony of Erroll Green, M.D., who testified that, even if the medical staff had been aware of Bruce's sleep apnea, that knowledge should not have changed the dosages of Dilaudid that Nurse Morton gave to Bruce. (Tr. 864.)

{¶ 29} After this testimony, the trial court asked Dr. Green a follow-up question:

> THE COURT: Doctor, I have – do have a question. If Nurse Morton had known of [Bruce's] sleep apnea problem, I thought I heard you say that it would have nevertheless been appropriate for her to give him the medications that she did. But if she had known about the apnea problem and she intended to give him the medications in the dosages in the amount that she did, should she have done anything else because he died?
>
> * * *
>
> THE WITNESS: * * * [B]oth she and the physician * * * taking care of her. Would have and should have ordered a CPAP machine so that he wouldn't – when he became – he wouldn't be able to become apneic.

(Tr. 867.)

{¶ 30} The trial court specifically noted that it found the expert "testimony of Dr. Green to be more relevant, accurate, and persuasive than that of Drs. Gengo and Holle," appellant's expert witnesses. (Feb. 9, 2015 Decision, 9.) The trial court also found that: "In addition, the alleged fatal effect of the Dilaudid and Phenergan as described by Drs. Gengo and Holle was not due to their dosage or administration. Rather, it was because they were administered to a patient who suffered from sleep apnea." (Decision, 9.) The testimony of the Hospital's experts supports these findings.

{¶ 31} Because Nurse Morton had no knowledge of Bruce's sleep apnea condition and, based on the evidence, bore no responsibility for the absence of that knowledge, she cannot be found to have breached a duty of care to Bruce for following the orders given to her by Dr. Kashyap.

**Bruce's Vital Signs Were Never Fully and Regularly Monitored**

{¶ 32} Appellant points to the supplemental report of Nurse Glower to argue that nursing standards require that blood pressure, pulse, respirations, and oxygen saturation be documented on all patients after IV administration of analgesics. He argues that Bruce's vital signs were neither regularly monitored nor documented.

{¶ 33} The Hospital's experts indicated that Nurse Glower's opinion was not the accepted standard of care. The opinion of Nurse Jenny Beerman, as well as that of Erroll Green, M.D., directly refuted the testimony and report of Nurse Glower. Nurse Beerman testified that, according to the physician's orders for Bruce, his vital signs were to be taken on the floor every four hours, and that order was within the norms of where Nurse Beerman practices. (Tr. 606.) Nurse Beerman testified that she would not do vitals after each administration of medication unless there was a concern. But in this case, Bruce was alert and had a zero for his sedation scale. (Tr. 620.) Dr. Green testified that it was not necessary to monitor vital signs pre- and post-administration of medication, and that Dr. Kashyap's order to take vital signs every four hours was "fine." (Tr. 856.) After evaluating the qualifications, assessments, assumptions, conclusions, and opinions of Nurse Glower, the trial court found the Hospital's expert witnesses to be more relevant, accurate, and persuasive. (Decision, 8.) There was reliable, credible evidence to refute Nurse Glower's opinion that Nurse Morton breached the standard of care with respect to taking Bruce's vital signs.

**Synergistic Effect of Pain Medications**

{¶ 34} According to Nurse Glower, the nursing staff failed to consider the synergistic effect of the opioids he received on the floor at the hospital combined with the medications he took at home before going to the emergency room and the medications he was given at the hospital. Appellant also presented the testimony of Dr. Fran Gengo, a clinical pharmacologist, who opined that Dilaudid and Phenergan had a synergistic effect that enhanced their sedative effect, and the sedative effect exacerbated Bruce's inability to breathe which was compromised by his sleep apnea condition.

{¶ 35} Here again, the trial court credited the testimony of Dr. Green over that of Nurse Glower and Dr. Gengo. Dr. Green refuted the testimony of Dr. Gengo about the synergistic effect of Phenergen and Dilaudid. (Tr. 831.) He further testified that, if Bruce had informed anyone of his sleep apnea, a CPAP machine would have been provided and that, once his pain was under control, he could have fallen asleep without the danger of respiratory arrest. (Tr. 867-69.)

**Dilaudid Given for Pain Rated Less Than Severe**

{¶ 36} Expert witness Nurse Glower opined that the nursing staff breached the standard of care by giving Dilaudid to Bruce when he rated his pain as 5 out of 10, or less than severe, when the range order was for 1 to 2 milligrams of Dilaudid for severe pain.

{¶ 37} There was testimony in the record not only from Nurse Morton but also from the Hospital's expert that the decision to give 2 milligrams of Dilaudid at 6:10 a.m. was within the standard of care.

{¶ 38} Nurse Morton explained her decision-making process, as follows:

Q. So what's the next entry?

A. 6:10, patient complained of pain, right upper quadrant, 5 out of 10, les severe than earlier in night, 2 milligrams of Dilaudid given.

Q. Okay, so going back to the order, you could have given him 1 or you could have given him 2 milligrams of Dilaudid for pain medication, correct?

A. Correct.

Q. So you have this patient at 6:10 in the morning. Why did you give him 2 milligrams of Diluadid at that time?

A. Because we're playing catch up with this patient is a term that we use, meaning we're never quite getting ahead of his pain. In the emergency room I'm aware from the paper work that came up with him that they've tried Lortabs; they've tried morphine, which is ineffective; they went to Dilaudid. He comes up to me and he's in agonizing pain. I've given him 2 milligrams of Dilaudid, and it did get more comfortable, then the pain is right back. We're not getting ahead. We're not getting adequate pain control from him. He's not telling me that his pain level is tolerable. I'm just trying to get him comfortable. So that's why I gave him 2 milligrams because I'd given 2 milligrams before and the pain rebounded, its right back.

Q. Did you have any concerns about what would happen if you just gave him 1 milligram instead of 2?

A. Just in this bit of experience with [Bruce], 1 milligram in the emergency room didn't do it for him. I think there's some question as to what time that 1 milligram of Dilaudid was administered in the emergency room. But by 3:00 he's in agonizing pain. The 1 milligram didn't buy him much pain relief. That's why I gave him 2 again. Knowing that he tolerated 2 milligrams just fine, no adverse reactions to it, his vitals had been stable, and I had no reason to believe there was any change in that, so I went ahead and gave him 2 instead of 1. I didn't feel 1 would be adequate for pain relief.

(Tr. 127-29.)

{¶ 39} Nurse Beerman testified that 2 milligrams of Dilaudid at 6:10 a.m. was within the standard of care for several reasons. His pain was getting worse. This was a young patient who had been uncomfortable all night long, not sleeping. Each time when Nurse Morton had assessed him, he was completely alert and not displaying any signs of overdosing on a narcotic. Under these circumstances, Nurse Beerman saw nothing about Dr. Kashyap's order for 1 to 2 milligrams of Dilaudid that could cause a nurse of ordinary care, skill, and diligence, to question the doctor's order. (Tr. 625-30.)

{¶ 40} Nurse Smith testified that the 2 milligram dose of Dilaudid at 6:10 a.m. was within the standard of care because it was within the range ordered by the physician,

Bruce's pain was coming back and moving up the scale, and he was a patient who had been in the facility for over 12 hours with very little rest and had been demonstrating pain for most of the time. Thus, it was appropriate to try to get on top of the pain. (Tr. 765-66.)

{¶ 41} Finally, Dr. Green also testified that the 2 milligram dose of Dilaudid at 6:10 a.m. was within the standard of care and reasonable. Prior to the arrest, there were no signs of overdose or respiratory suppression. Nurse Morton "observed him at 6:45, which was 35 minutes, approximately, after she gave the last dose. That's at the point – a little beyond the point where you would expect that last dose of Dilaudid to have made its peak impact on him and you wouldn't expect anything further in terms of sedation or respiratory depression after that." (Tr. 835-36.)

**Failure to Follow the Nursing Process**

{¶ 42} Appellant argues that the nursing staff breached the standard of care for patients receiving narcotic medications. Appellant reiterates that Bruce should have been more closely monitored while on the floor.

{¶ 43} As discussed previously, Bruce was one of six patients under Nurse Morton's care during her twelve-hour shift. Nurse Morton's handwritten progress notes show that she entered Bruce's room at least seven times in four hours. The notes state:

> 0300 Pt. admitted from ED, assessment started, teaching done, data base given to pt. Screening tool reviewed with pt.
>
> 0355 Pt. c/o RUQ pain radiating to flank. 2 mg Dilaudid given will continue to monitor.
>
> 0415 Pt. states pain ↓ tolerable now.
>
> 0500 Pt. c/0 nausea, Phenergen given.
>
> 0530 Pt. states ↓ nausea at this time.
>
> 0610 Pt. c/o pain RUQ 5/10 less severe than earlier in the night. 2 mgs Dilaudid given.
>
> 0645 Pt. states pain 1/10, lying in bed.

(Joint Exhibit 8, 4-16.)

{¶ 44} Nurse Glower's opinion notwithstanding, the weight of the evidence supports the conclusion that Nurse Morton adhered to the standard of care for patients receiving narcotic medications.

**Proximate Cause**

{¶ 45} Appellant contends that all of the alleged respective breaches of care outlined above were the direct and proximate cause of the death of Bruce. Appellant again points to the report of Nurse Glower, who testified as an expert on behalf of appellant.

{¶ 46} Appellant offered the testimony of Dr. Holle as to cause of death. Dr. Holle opined that the most likely cause of death was an overdose of narcotics combined with Phenergan. (Tr. 333-34.) He believed that, even the first 2 milligram dose of Dilaudid at 3:35 a.m. when Bruce was rating his pain as 8 on a scale of 10 was a breach of the standard of care. (Tr. 347.) Appellant's expert, Dr. Gengo, testified that Bruce's total body burden of narcotics was sufficiently high enough that it could cause respiratory arrest in an opiate naïve patient. Dr. Gengo was asked:

> Q. If I understand your opinion and I want to sum this up as best as I possibly can, based on a reasonable degree of pharmacological probability, [Bruce] is a patient with severe obstructive sleep apnea and a body burden load of I believe you said 25 milligrams of morphine at about 7:00 a.m. when he had his respiratory arrest, that that opiate analgesics more likely than not significantly contributed to his arrest?
>
> A. Yes, I would agree with that.

(Tr. 204.)

{¶ 47} Dr. Gengo was then asked whether that would be true if Bruce did not have sleep apnea, and he was unable to give a definitive answer. ("I really don't think I can say that." (Tr. 205.))

{¶ 48} The autopsy report stated that the "anatomic cause for the spontaneous cardiopulmonary arrest could not be identified." (Joint Exhibit 8, Tab 5, p. 3.)

{¶ 49} Dr. Green refuted the testimony of Drs. Gengo and Holle regarding the synergistic effect of Dilaudid and Phenergan, and the trial court found his testimony to be more credible. He opined that the medications ordered in the emergency room were within the standard of care, and Bruce did not suffer any ill effects from them. Also, by

6:00 a.m., the vast majority of the opiates administered in the emergency room would have been metabolized.  (Hospital's Exhibit K.)  He also testified that the autopsy did not show a clear cause of death, but two possibilities were cardiac arrhythmia due to Bruce's sleep apnea and respiratory arrest due to his sleep apnea.  (Tr. 849-50.)

**CONCLUSION**

{¶ 50}  Upon thorough review of the record, we conclude that there was competent, credible evidence which, if believed, would support the trial court's finding that Nurse Wendy Morton did not breach the accepted standard of care in her treatment of Bruce. Nor was appellant able to show that the alleged negligence was the proximate cause of Bruce's death.  Therefore, the trial court's finding was not against the manifest weight of the evidence. The  assignment of error is overruled.

{¶ 51} Based on the foregoing, the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

LUPER SCHUSTER and HORTON, JJ., concur.

_____