[Cite as *Bugh v. Ohio Dept. of Rehab. & Corr.*, 2024-Ohio-2785.]

## IN THE COURT OF CLAIMS OF OHIO

| | |
|---|---|
| ROGER BUGH, Admr. | Case No. 2016-00387JD |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | DECISION OF THE MAGISTRATE |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, as administrator of the estate of Richard Bugh, brought this case to trial against defendant, Ohio Department of Rehabilitation and Correction, on a claim of medical negligence, alleging that defendant failed to properly treat, manage, and/or diagnose Bugh's diaphragmatic paralysis. The case proceeded to trial before the magistrate.

**Summary of Testimony**

{¶2} Bugh, who passed away in 2020, sat for depositions on October 19, 2016, and August 22, 2019, and the transcripts of the depositions were read into the record. Therein, Bugh testified about his background, from his birth in 1951 through his imprisonment in defendant's custody in 1989 to serve a 25-year prison sentence for the rape of his four-year-old daughter, spending the last several years of that term at Grafton Correctional Institution (GCI).

{¶3} Bugh testified that in 2008 he noticed he was getting winded easily and having trouble breathing. Bugh stated that the prison medical providers arranged appointments for him with one or more specialists at The Ohio State University Wexner Medical Center (OSUWMC), including Dr. James O'Brien. Bugh recalled that he came to be diagnosed at OSUWMC with left diaphragmatic paralysis. Bugh recalled a doctor there instructing him to perform breathing exercises, which he understood was because the doctor thought his vocal cords were closing when he breathed. According to Bugh, he was doing better

by the time he had a follow-up appointment with Dr. O'Brien on October 13, 2009. Bugh explained that he believed that the improvement resulted from his learning to breathe with his chest muscles.

{¶4} According to Bugh, he did not seek any medical attention for breathing complaints for the next couple of years, until finding himself gasping for air when lying down, apparently in 2011. Bugh testified that these complaints of not being able to breathe when lying down led to him being transported to Elyria Memorial Hospital and then flown by helicopter to OSUWMC in Columbus in October 2011, where he remained for about a month, during which time he saw many specialists and underwent various tests, but from what he understood the cause of his complaints was not determined. When OSUWMC discharged him, Bugh stated, he was provided a bi-pap machine to assist with breathing when lying down and he continued to use a bi-pap machine from that time on, basically when he slept. Bugh stated that he never used a c-pap machine and was never diagnosed with sleep apnea. Bugh also stated that he was never diagnosed with chronic obstructive pulmonary disorder (COPD).

{¶5} Bugh described how, in addition to being unable to breathe on his own when lying down, since he relied on his chest muscles to breathe it became difficult to breathe if he ate too much or engaged the chest muscles to lift something, so his provider at GCI at that time, Dr. Todd Hoaglan, instructed him to eat six small meals a day to avoid bloating.

{¶6} Bugh stated that he continued to receive medical attention from Dr. Hoaglan at GCI and specialists at OSUWMC or defendant's Franklin Medical Center. Bugh recalled that in 2012 one or more providers recommended that he undergo an MRI for diagnostic purposes but a standard MRI machine would not work for him because he could not use his bi-pap machine and would thus be unable to breathe when lying down inside the machine, and he believed that he should not be intubated to undergo the MRI either. Bugh testified that he understood his providers consequently ordered a "standing MRI" for him, i.e. in a device where he would not have to lay down, and he was sent to OSUWMC multiple times to undergo the MRI, but there was no such device at OSUWMC and he thus never received an MRI before his release from prison. Bugh recalled asking

Dr. Hoaglan and another official at GCI if he could be seen at the Cleveland Clinic or at a Department of Veterans Affairs (VA) hospital, but he was told that this was not allowed.

{¶7} Bugh testified that the day he got out of prison in 2014 he went to the VA hospital in Cleveland because he had arranged to get a new bi-pap machine there and stay at a dormitory there, although he wound up going to live with an old friend, Elaine Collins. At the VA hospital that day, a pulmonologist, Dr. Strohl, examined him and without obtaining any diagnostic studies told him that both his diaphragms were paralyzed, whereas previously he understood he had only been diagnosed with left diaphragmatic paralysis, Bugh recounted.

{¶8} Bugh testified that he made a follow-up visit to the VA hospital in Cleveland to see a neurologist, Dr. Ansari, who performed an EMG nerve study and concurred with Dr. Strohl that the diaphragmatic paralysis was bilateral. While Bugh understood that Dr. Strohl had ordered the EMG to determine if a pacemaker could be used to treat Bugh's condition, Dr. Ansari said that a pacemaker was not an option and that there were no treatment options because the nerve damage was irreversible, he recalled. Bugh understood that arthritis in his neck caused the phrenic nerves to be pinched, resulting in the paralysis, and he testified that before seeing Dr. Ansari he had never been told that he had arthritis in his neck. As Bugh explained, though, he previously knew of arthritis elsewhere in his body, including his back, feet, and knees, which he understood were caused by previous injuries, particularly from two serious motor vehicle accidents in the 1980s, before he went to prison. Bugh stated that among the several medications he took, he had been on arthritis medication since his time in prison, and he also began wearing a special supportive type of shoe while in prison on account of his arthritic feet.

{¶9} Bugh discussed other health issues he had, including intermittent lower back or sciatic pain for which he wore a TENS unit for many years, a heart catheterization and stent placement in about 2005, and headaches and gastro-esophageal reflux disease more recently. Bugh also acknowledged having smoked two to four packs of cigarettes a day for many years. Bugh explained that in the years after his release from prison, he received most of his medical care through the Canton or Cleveland VA hospitals.

{¶10} Bugh testified that in the years after his release from prison, he continued using a bi-pap machine every night when sleeping, although sometimes he slept upright

in a recliner for a bit without the machine before going to bed or if there was a power outage. Bugh stated that he tended to fall asleep when watching television or reading, which he thought was a result of having a low oxygen level due to his breathing issues, and similarly he could not drive his pickup truck for long because it made him sleepy. Bugh described undergoing a diaphragmatic plication surgery in late 2017 through the VA and noticing some modest improvement in his breathing afterward but he still relied on the bi-pap machine at night and could not breathe if he exerted himself, particularly his chest muscles, like if he lifted something heavier than five pounds. Bugh stated that he still ate several small meals a day, as Dr. Hoaglan had recommended years before, because eating a big meal made it difficult to breathe. According to Bugh, his medical providers had told him there were no other treatment options available for his diaphragmatic paralysis.

{¶11} Bugh related that after leaving prison, he never held a job, relying instead on a VA pension and Social Security benefits. Bugh testified that he was 63 years old when he left prison and could not perform the kind of construction work that he used to before going to prison. Bugh described doing some home improvement work for himself but said that he was too slow to be hired by anyone. If not for his breathing problems, Bugh stated, he felt that he would have been able to go to back to work. Bugh admitted that his arthritis caused him some pain and soreness but said that it did not stop him from working before he went to prison. Bugh talked about not being able to enjoy things that he used to, like going for walks, and having an overall low quality of life. Bugh stated that he was able to cook for himself and his ex-wife, Carolyn Bugh, with whom he lived in his later years, but that she had to handle most other household duties, especially anything that involved negotiating the stairs.

{¶12} Elaine Collins testified that she and Bugh had a personal relationship and lived together for several months before he went to prison. Collins recalled Bugh being physically active and working long hours as a self-employed contractor or maintenance man. Bugh performed some home improvement work for Collins, she stated, and she saw him use the stairs and lift things with no difficulty, having no trouble breathing. Collins testified that they regularly visited for the first few years of Bugh's prison term, and

although she stopped visiting so that she could spend more time with her children, they continued to write letters and talk on the phone over the years.

{¶13} Collins testified that Bugh moved in with her as soon as he was released from prison and she learned about his breathing problems and the bi-pap machine he relied on for sleeping, having previously understood that he was having some health issues while in prison but not knowing the specifics. Collins stated that Bugh was no longer able to work like he did back in the 1980s because of his breathing problems, and tasks took him three or four times as long to perform; for example, it took them some six months of working together to make some minor improvements to her kitchen, whereas before he went to prison he remodeled her entire house in that amount of time. In the almost two years that they lived together after Bugh left prison, the only work Collins recalled him performing for money was doing some odd jobs for an elderly couple she knew.

{¶14} Bugh's health worsened in the time they lived together, Collins stated. Collins explained how Bugh came to move out of the house due to some interpersonal problems but that they stayed in contact and she came to see him not long before he died in 2020, after he told her that he had been diagnosed with lung cancer.

{¶15} Carolyn Bugh testified that she and Bugh were married from 1984 to 1989 and that Bugh's imprisonment resulted from him raping their daughter who was four years old at the time. In the time Carolyn knew Bugh before his imprisonment, she stated, he worked in a coal mine and then in construction and other physically demanding occupations and he was physically active in his leisure time. Carolyn recounted them being in communication for the first couple of years after Bugh went to prison but then they stopped, and it was about two years after Bugh finished his 25-year sentence that they reconnected. After Bugh moved out of Collins' house and got his own place in Canton, Carolyn moved in with him in about December 2016 and they lived together until his death in October 2020, she stated.

{¶16} In those final years, Carolyn stated, Bugh had a hard time breathing and could not climb stairs or an incline without having to stop and catch his breath. Carolyn testified that Bugh was able to drive and do some work around the house, but it took him a long time to accomplish anything and he was not capable of performing the physically

demanding work that he used to.  Bugh was diagnosed with lung cancer in 2019 and passed away in October 2020, Carolyn testified.

{¶17} David Thomas, M.D. testified as an expert witness for plaintiff via deposition.[1]  Dr. Thomas explained that he is licensed to practice medicine in the state of Florida and is board-certified in ophthalmology, and for about 17 years he specialized in that field until transitioning to practice medicine within the Florida Department of Corrections in 1993.  Dr. Thomas, who noted that he also served in the Florida legislature from 1984 to 1994, explained that he rose through the ranks of the Florida Department of Corrections to become Assistant Secretary for Corrections, in which role he oversaw the healthcare of approximately 80,000 inmates across 55 facilities.  Dr. Thomas stated that after his state corrections service he taught medicine at Nova Southeastern Medical School until retiring in 2019 but he continues to see a few general medicine patients in his home-based private practice in Sarasota.  Dr. Thomas also noted that he has both a doctorate in education and a juris doctor and practices as a lawyer.

{¶18} According to Dr. Thomas, the medical records that he reviewed for this case, at least the way they were presented to him, were disorganized and made it difficult to follow the chronology of Bugh's care.  Dr. Thomas also explained that the records obtained from defendant included an MRI report for another inmate, which he referenced in his initial expert report as pertaining to Bugh, and once it was discovered that the record did not pertain to Bugh he had to revise his report.  Dr. Thomas noted certain aspects of Bugh's health history that he was able to put together, though, including his history of serious injury accidents in the 1980s.  Dr. Thomas testified that Bugh was evaluated for complaints of breathing problems in 2008 and that test results indicated the left phrenic nerve was compromised, which his providers noted on June 16, 2008, to be paralysis of the left phrenic nerve. (Exhibit 1, p. 000534.)  Dr. Thomas explained that the left and right phrenic nerves, located in the neck region, are responsible for moving the diaphragm up and down to create a vacuum that sucks in air and blows air out.

---

[1] In the transcript of the deposition, the objections on pages 27, 30, 36, 39, 43, 44, 51, 58, 67-79, and 112 are OVERRULED.

{¶19} As Dr. Thomas related, Bugh was referred to James M. O'Brien, M.D. at OSUWMC for a pulmonary evaluation of shortness of breath and the possibility of hemidiaphragmatic paralysis; Dr. O'Brien saw Bugh on November 4, 2008, and wrote a report in which he related that his impression was that Bugh had shortness of breath of unknown etiology, but that given Bugh's history of smoking two to four packs of cigarettes daily for 47 years, COPD was a possibility, and among other things he recommended that Bugh get pulmonary function tests.  (*Id.*, pp. 000881-000882.)  But Dr. Thomas stated that he saw no evidence of COPD or emphysema in Bugh's medical records, so he did not believe smoking was related to the shortness of breath.

{¶20} Dr. Thomas stated that, after Bugh underwent the recommended pulmonary function testing, Bugh followed up with Dr. O'Brien on January 9, 2009 and again on April 10, 2009, and he was referred for evaluation of vocal cord dysfunction.  (*Id.*, pp. 000278-000279, 000958-000959.)  As Dr. Thomas related, it was Dr. O'Brien's impression that the shortness of breath was related to vocal cord dysfunction and some hemidiaphragmatic paralysis, and his recommendations included breathing exercises and a follow-up pulmonary medicine evaluation.  There was no diagnosis up to this point of the underlying cause of the left diaphragmatic paralysis, which made it difficult to treat, Dr. Thomas stated.  But Dr. Thomas stated that it had been an appropriate first step for the medical providers at GCI to refer Bugh to OSUWMC for his breathing complaints, and it had been appropriate specifically to refer Bugh to the pulmonology department.

{¶21} Dr. Thomas related that from this time up to 2011, Bugh apparently did not receive much medical attention for complaints of shortness of breath, but records show that he complained of worsening breathing problems in October 2011 and the providers at GCI referred him to OSUWMC at that time for consultation, through which it was determined that the bottoms of his lungs were not opening.  Dr. Thomas explained that this was consistent with his complaints of worsening breathing problems, and while the left lung was worse, both were affected.  Dr. Thomas stated that with both lungs being affected, and with it apparently being determined by the providers at GCI in 2011 that he also had a right winged scapula (*Id.*, p. 000354), this demonstrated that the right phrenic nerve was compromised, in addition to the left phrenic nerve.  Dr. Thomas discussed the report from a CT scan that Bugh underwent on October 26, 2011, and how it showed the

right phrenic nerve was becoming compromised.  (*Id.* p. 002265.)  According to Dr. Thomas, if both phrenic nerves are paralyzed, the diaphragm cannot move and a patient would require intubation to survive.

{¶22} Dr. Thomas explained some of the other testing that Bugh underwent at this time and how Dr. Bakri Elsheikh, a neurologist at OSUWMC who evaluated Bugh in October 2011, believed that a myopathic process was suggested and determined that Bugh needed a bi-pap machine, which is a breathing machine involving the patient wearing a mask through which air is forced into their lungs.  (*Id.* at p. 002284.)  A report from OSUWMC dated November 19, 2011, described how Bugh had to be transported there and intubated after experiencing shortness of breath while undergoing a CT scan at another facility and the providers at OSUWMC were considering the possibility of Bugh having myasthenia, or generalized muscular weakness throughout the body.  (*Id.* at pp. 000481-000484.)  Dr. Thomas stated that the providers at OSUWMC followed Bugh during his hospitalization and only released him back to defendant's care after he underwent EMG and sniff tests, neurology consultations, and visits with several specialists.

{¶23} Back at GCI, Dr. Thomas stated, a December 23, 2011 note that was probably written by Dr. Hoaglan documented that Bugh's shortness of breath was worsening, and he was to follow up for neuropathic and myopathic evaluation.  (*Id.* at p. 000567.)  Dr. Thomas acknowledged that the note reflects that Dr. Hoaglan was concerned about the left diaphragmatic paralysis and with trying to work it up to determine the cause of it, and that referring Bugh to the specialists at OSUWMC like Dr. Hoaglan did was a way of working it up.  Dr. Thomas also acknowledged that, at the request of the providers at GCI, Bugh was seen for a neurology consultation on January 10, 2012, and as a result it was recommended that he undergo an MRI of the brain, cervical spine, and right brachial plexus, but Bugh signed a Release of Responsibility form on February 27, 2012, for refusing to undergo the recommended MRI.  (*Id.* at pp. 000467, 000470.)  Dr. Thomas felt that it was understandable that Bugh refused the MRI because he feared not being able to breathe, and he pointed out that Bugh still wanted to find a way to obtain the MRI.

{¶24} On May 14, 2012, Dr. Thomas stated, Bugh wrote in an internal "Health Services Request" form at GCI that he was having trouble breathing even when he was not lying down. (*Id.* at p. 000831.) Dr. Hoaglan saw Bugh several days later and again requested an MRI, one in a series of efforts to obtain an MRI of Bugh's brain, cervical spine, and brachial plexus, Dr. Thomas stated. (*Id.* at p. 000556.) Dr. Thomas testified that in October 2012, Dr. Hoaglan wrote a consultation request to the radiology department at OSUWMC for evaluation of Bugh's brain, cervical spine, and right brachial plexus concerning the development of right diaphragmatic hemiparalysis, and he noted that Bugh, given his resistance to being intubated, would need to either stand or use long tubing with his bi-pap machine during the MRI because he could not breathe when lying down, though later notes indicated that the GCI providers determined these were not available methods of obtaining the MRIs. (*Id.*, p. 000420.)

{¶25} Bugh continued to report breathing problems, Dr. Thomas stated, as seen in a December 9, 2012 Health Services Request form asking to see Dr. Hoaglan. (*Id.*, p. 000817.) According to Dr. Thomas, a December 20, 2012 progress note from Dr. Hoaglan reflected that Bugh's symptoms had continued to worsen, there was paralysis developing with the right phrenic nerve, and while an MRI was recommended Dr. Hoaglan explained that it could not be completed since Bugh would not be intubated, so Bugh was being referred back for a neurology consultation to explore his options. (*Id.* at p. 000441.)

{¶26} Dr. Thomas summarized that at this point it had been four years since Bugh's shortness of breath manifested in 2008, and while there had been a diagnosis of diaphragmatic paralysis on the left side and now exploration of the right side, Bugh was getting worse and there had still been no diagnosis or treatment as to the cause of the paralysis. Dr. Thomas discussed further records in 2013 of Bugh's complaints and the care he received through his release from defendant's custody in 2014, and how the records do not show that the etiology of Bugh's problems were ever determined in that time.

{¶27} Dr. Thomas opined that the underlying cause of Bugh's breathing problems was his phrenic nerves being compromised, with the left side being worse, and that the paralysis of the phrenic nerves resulted from spinal cord compression stemming from the

motor vehicle accidents he had in 1980 and 1989.  According to Dr. Thomas, defendant's medical providers should have investigated spinal cord compression as a cause of Bugh's diaphragmatic paralysis, especially in light of Bugh having a winged scapula, and because, according to Dr. Thomas, neither the pulmonology studies nor the studies into the theory of Bugh's problems being muscular in nature produced a reasonable diagnosis. As far as Dr. Thomas could discern, the medical records do not show that spinal cord compression was ever considered, which falls below the standard of care.

{¶28} Dr. Thomas acknowledged, though, that Dr. Hoaglan and other providers made several attempts to have Bugh undergo an MRI of, among other things, his cervical spine, and he opined that this was reasonable.  While Dr. Thomas admitted that Bugh refused to undergo an MRI as recommended, and that patients have the right to refuse recommended care, he saw no indication that any providers educated Bugh as to the importance of getting an MRI and he stated that failing to do so fell below the standard of care.  In his opinion, an MRI of the cervical spine in 2012 would have shown compression of the spinal cord.  Dr. Thomas acknowledged that, in addition to spinal compression, diaphragmatic paralysis can be caused by several things, including lupus, drugs, myasthenia and other muscle wasting diseases, muscle infections and inflammations, imbalances in electrolytes, and a tumor.

{¶29} Dr. Thomas also stated that after Bugh's refusal to undergo an MRI, Dr. Hoaglan needed to take further action toward determining the etiology of the problem, particularly exploring the neck, and this would include referring Bugh to a neurosurgeon. Dr. Thomas stated that Dr. Hoaglan did not do enough to that end, with regard to referring Bugh to consultants to evaluate the neck.  Dr. Thomas also stated he felt the consultants at OSUWMC should have eventually arrived at the conclusion that the spine was compromising the phrenic nerves, and he even opined that there was a combined failure on the part of both Dr. Hoaglan at GCI and the pulmonologist Dr. O'Brien at OSUWMC to meet the standard of care; he also felt that the neurology department at OSUWMC did not go far enough in pursuing the cause of Bugh's problems but could not say whether the professionals in that department failed to meet the standard of care.  After the specialists at OSUWMC could not determine the cause of the problems, however, it was

incumbent on Dr. Hoaglan as Bugh's primary care doctor to continue looking into the cause, according to Dr. Thomas, and he did not do enough in that regard.

{¶30} Dr. Thomas stated that, while his experience with patients having the condition is limited, he has seen patients with diaphragmatic paralysis who underwent surgical repair of the cervical spine and the procedure stopped the progression of the disease, and if the surgical intervention occurs early on in the progression of the disease it can even reverse the disease. Dr. Thomas opined that surgical intervention in Bugh's case probably would not have reversed the paralysis in the left side but probably would have at least significantly improved the right side. And if Bugh were not a surgery candidate, Dr. Thomas stated, diaphragmatic pacing probably would have provided relief if performed no later than July 2012.

{¶31} Hal Pineless, D.O. testified as an expert witness for plaintiff via deposition.[2] Dr. Pineless went over his educational and professional background, including that he is a board-certified neurologist practicing in Winter Park, Florida, and is licensed to practice medicine in that state. Dr. Pineless had an affiliation with the Florida Department of Corrections for about 12 years through which he saw inmate patients, he stated. Discussing the materials that he reviewed for the case, Dr. Pineless stated that the medical records were convoluted and out of order, and, like Dr. Thomas, he explained how he had to rewrite his expert report after initially relying on a medical record that belonged to another inmate.

{¶32} Dr. Pineless described the documented history of trauma to Bugh's head and neck, and how in 2008 he began receiving medical attention for breathing problems, including undergoing fluoroscopy and 'sniff' testing which produced results consistent with paralysis of the left phrenic nerve. (*Id.* at p. 000887.) The left and right phrenic nerves run from the C-3 to C-4 area of the spine to the diaphragm and are important for breathing, Dr. Pineless explained, but a patient with paralysis on only one side typically continues living normally.

---

[2] In the transcript of the deposition, the objections on pages 50, 51, 73, 96, 101, 110, 112, 114-117, 126 are OVERRULED; the objections on pages 69 and 95 are SUSTAINED.

{¶33} Dr. Pineless summarized the reports that Dr. O'Brien, the pulmonologist at OSUWMC, made after seeing Bugh for consultations, including that Dr. O'Brien felt that vocal cord abnormalities might have been the problem and that he wanted to work that up, as the symptoms were more than what one would expect to see from left diaphragmatic hemiparalysis alone, and in April 2009 he concluded that the shortness of breath was indeed likely due to vocal cord dysfunction as well as some element of hemidiaphragmatic paralysis. (*Id.* at pp. 000278-000279, 000958.)

{¶34} Dr. Pineless observed that other than albuterol, which is used for breathing, between 2009 and 2011 there was a gap without treatment of the breathing problem or a definitive diagnosis. In 2011, Bugh's complaints reemerged, Dr. Pineless stated, and according to an October 2011 radiology consultation request, the symptoms had worsened; that report noted Bugh's motor vehicle accident history, which Dr. Pineless explained was significant because that kind of history can cause changes in the spine, including compression. (*Id.* at p. 000073.) An October 2011 report from neurologist Dr. Elsheikh at OSUWMC provided that he thought Bugh's problems were muscle-related rather than nerve-related, and he recommended pursuing that theory with a muscle biopsy, Dr. Pineless related. (*Id.* at pp. 000477, 002284.) Dr. Pineless discussed an October 2011 discharge summary from OSUWMC identifying consultations Bugh had in several disciplines as well as muscle biopsy, EMG, and chest CT tests. (*Id.* at p. 002271.) Bugh's CT of the chest showed that the left hemidiaphragm was relatively unchanged since 2008 but there were changes observed on the right side, Dr. Pineless related. (*Id.* at p. 002266.) According to Dr. Pineless, the involvement on the right side is suggestive of there potentially being a spinal problem paralyzing the phrenic nerves. And, Dr. Pineless explained, it was noted in 2011 that Bugh had a right winged scapula (also known as a shoulder blade), which was also an indication that there may have been some weakness developing on that side. (*Id.* at p. 000354.) Progress notes from December 2011 indicate that Bugh's ability to breathe continued to worsen, Dr. Pineless said. (*Id.* at p. 000567.)

{¶35} Dr. Pineless stated that in October 2012 the providers at GCI submitted a consultation request for OSUWMC to evaluate Bugh's brain, cervical spine, and right brachial plexus for development of right diaphragmatic hemiparesis, with the instruction

that Bugh needed a "standing MRI" or to undergo an MRI with long tubing for use with a bi-pap machine because he could not breathe when lying down.  (*Id.* p. 000420.) Dr. Pineless stated that there are some facilities in the United States where standing MRIs can be performed and he believed that there was one somewhere in Ohio, but he did not know where, and he admitted that the hospitals that he works with do not have them. Addressing the fact that Bugh never did undergo an MRI before his release from defendant's custody but eventually did so at the VA hospital with the aid of intubation and sedation, Dr. Pineless opined that defendant's medical providers were not aggressive enough in trying to get Bugh to undergo an MRI and that they did little for him after he refused to undergo an MRI.

{¶36} Dr. Pineless characterized Bugh's medical records as showing breathing complaints from 2008 to 2014 and getting worse over that time, without the etiology ever being diagnosed nor the underlying problem being treated.  In Dr. Pineless' opinion, Bugh's motor vehicle accidents in the 1980s damaged the cervical spine at the C-3/C-4 level which later resulted in his breathing problems; those problems were associated with left diaphragmatic paralysis initially, and in 2011 to 2012 Bugh developed right wing scapula and diaphragmatic weakness in the right side.  Dr. Pineless was asked on cross-examination about records from 2017 in which Dr. Raymond Onders wrote that the right diaphragm appeared to work, but Dr. Pineless stated that insofar as the right diaphragm was documented to be weak in 2012, he would expect it to be at least the same, if not worse, in 2017.

{¶37} Dr. Pineless opined that defendant's medical providers deviated from the standard of care by not treating Bugh's breathing problems more aggressively— particularly not obtaining an MRI—in 2011 and 2012, during which time a cervical laminectomy or other surgical intervention would probably have provided significant relief. According to Dr. Pineless, 2012 would have been the latest that a surgery could have provided meaningful relief to Bugh.  Dr. Pineless stated that the 2017 record from Dr. Onders indicating that the right diaphragm appeared to work at that time does not change his opinion that surgery was needed in 2012.

{¶38} Stated differently, Dr. Pineless opined that defendant's medical providers did not perform an adequate work-up for Bugh's breathing complaints, to explore the potential

diagnoses. Dr. Pineless allowed that there are several things that can cause diaphragmatic paralysis, or at least unilateral paralysis. And Dr. Pineless admitted that, from the time in 2008 when Bugh's breathing complaints began, defendant's medical providers and the consultants at OSUWMC to whom they referred Bugh took several reasonable measures toward working up Bugh's complaints and exploring different diagnoses, or as to disciplines such as pulmonology that are outside Dr. Pineless' area of expertise, the measures at least made sense. For example, Dr. Pineless did not take issue with exploring COPD, vocal cord dysfunction, or muscular issues as potential causes of Bugh's complaints, but overall he felt that Bugh's providers overlooked the cervical spine as a potential cause.

{¶39} Dr. Pineless admitted having limited experience with diaphragmatic paralysis patients, having seen one patient in the 1990s with unilateral paralysis. Dr. Pineless also admitted that this case represents the only case in which he has given testimony against a physician outside his field of expertise, as Dr. Hoaglan functioned as a primary care physician rather than a neurologist. But Dr. Pineless stated that the standard of care for a primary care physician requires taking positive steps toward diagnosing and treating a condition that progressively gets worse over a period of years, which he does not feel occurred in this case.

{¶40} John F. Burke, Jr., Ph.D., an expert witness for plaintiff, testified that he is an economist with the firm of Burke, Rosen & Associates in Cleveland, which primarily performs economics analyses in legal matters. Burke detailed his educational and professional experience and stated that after many years of teaching economics he retired as an adjunct professor at John Carroll University in 2021. Burke authenticated two reports that he prepared for this matter, one before Bugh died and one after, and explained his methodology for calculating future wage loss figures for Bugh, reduced to present value.

{¶41} Joseph Patrick Hanna, M.D. testified as an expert witness for defendant. Dr. Hanna described his education, training, and experience as a neurologist and administrator with Pristina Health in Greenville, South Carolina. Dr. Hanna, who is board-certified in neurology and cerebrovascular disease, is licensed to practice medicine in South Carolina and Ohio, he stated, and previously worked with and trained Dr. Onders

in Cleveland.  Dr. Hanna also described his history of publishing in and reviewing medical journals as well as his research.

{¶42} Dr. Hanna estimated that about half his patients are recovering from strokes while the others are general neurology patients, which would include someone like Bugh. Dr. Hanna stated that he is familiar with diaphragmatic weakness and paralysis.  Among the patients he sometimes sees are those with diaphragmatic weakness, he stated, and typically the cause of the weakness is unknown and is being worked up by the patient's providers.  Dr. Hanna explained the concept of a differential diagnosis, in which a provider explores potential diagnoses based on the patient's circumstances.  A history of smoking would be important for a primary care doctor to know, Dr. Hanna stated.  Motor vehicle accidents in a patient's history would be something Dr. Hanna would expect a neurologist to determine, he stated.

{¶43} The diaphragm, Dr. Hanna explained, is a muscle that pulls the lungs to inflate and contract and is reached by a left and right phrenic nerve that each comes from the C-3 to C-5 level of the spine.  Either side or both sides of the phrenic nerve/diaphragm can be paralyzed, Dr. Hanna stated, though it is an uncommon illness, with most cases being unilateral rather than bilateral, and there are many causes of diaphragmatic weakness, particularly several forms of muscular or neurological disease.  There used to be more cases of diaphragmatic paralysis because it could occur when patients' chests were split open during open heart surgery, but as such operations have become less invasive this is no longer as common.

{¶44} Dr. Hanna related that primary care physicians refer patients to him, usually wanting him to opine on how to best help the patient or alleviate some of their symptoms; for example, the referring physician may relate that the patient has right sided weakness and request an assessment.  In turn, Dr. Hanna stated, he makes referrals to other specialists such as neurosurgeons and pulmonologists, for example asking a neurosurgeon if surgery could help the patient.  According to Dr. Hanna, primary care physicians are responsible for coordinating care for the patient, while the specialists to whom they refer patients then entertain diagnoses.  Dr. Hanna discussed fluoroscopy and sniff testing, EMG testing, and cervical spine MRIs as being some of the methods that may potentially point to the cause of diaphragmatic paralysis, but he also stated that

diaphragmatic paralysis may be idiopathic and involve multiple systems of the body.  Dr. Hanna stated that he understood Bugh was delayed for several years in getting an MRI of his cervical spine because he refused to be intubated.  According to Dr. Hanna, in his experience physicians continue to ask the patient to undergo a diagnostic procedure like this when indicated, but they cannot force the patient to undergo the procedure unless the patient is incompetent.  Dr. Hanna stated that no hospital he has been to, including the Cleveland Clinic, has had a standing MRI scanner.

{¶45} Dr. Hanna described his understanding of Bugh's history, including his chronic history of smoking, and how, when he started becoming progressively short of breath, he was found to have left side diaphragmatic weakness.  Bugh was referred to OSUWMC for consultations and testing, Dr. Hanna related, and while no cause was found for the diaphragmatic weakness, his symptoms were treated as best they could be, including with the bi-pap machine.  Indeed, according to Dr. Hanna, the most common outcome with diaphragmatic weakness is that it remains idiopathic, or of unknown origin.  Medicine is not a perfect science, Dr. Hanna testified, and sometimes there are issues that the physician investigates and cannot determine a cause for, but the physician will continue following the patient and try to do no harm.

{¶46} Dr. Hanna related that, starting in 2011, some providers thought Bugh was developing diaphragmatic weakness on the right side, but that it is difficult to tell what was happening on the right side, and, after Bugh's release from custody, testing by Dr. Onders at the VA revealed normal motion and thickness of the right diaphragm, which excluded it as a problem.  Regarding Dr. Ansari at the VA hospital not finding function in the phrenic nerves under EMG testing, Dr. Hanna stated that there had to have been phrenic nerve function or else Bugh's diaphragm would not have been able to contract at all, and that an EMG is not the best test for phrenic nerve function.

{¶47} Dr. Hanna's opinion was that the cause of Bugh's breathing problems was multifactorial, meaning multiple causes contributed to it, including side-effects of smoking as well as the idiopathic diaphragmatic weakness.  According to Dr. Hanna, it would be difficult for a patient with a history of smoking like Bugh's to avoid COPD, and the albuterol that Bugh was prescribed is a common treatment for COPD.  The diaphragmatic weakness probably had myopathic and neuropathic (originating from the cervical spine)

causes, Dr. Hanna stated.  Dr. Hanna also explained how the results of an EMG study performed by Dr. Elsheikh at OSUWMC in October 2011 were, in his opinion, more consistent with a myopathic process than a nerve problem.  (*Id.* at pp. 003770-003772.) Dr. Hanna acknowledged, though, that the cause of Bugh's myopathic weakness was unclear.  To the extent that the providers at the VA hospital did not conclude there was a myopathic process, Dr. Hanna opined that such a process simply did not manifest in a way where they could determine its existence and that it would be difficult to exclude such a process.

{¶48} Dr. Hanna discussed the concept of there being strong and weak indications for surgery, for instance unilateral diaphragmatic weakness in a patient would be a weak indication for surgery; an example of a strong indication, on the other hand, would be a patient with a clear cut unifactorial cause that could be easily alleviated, such as a strap of muscle pushing on the phrenic nerve that can be resected to release the pressure. Surgery is not indicated with a patient for whom the cause or causes of diaphragmatic weakness is unknown, according to Dr. Hanna.

{¶49} In terms of the treatment for any myopathic process Bugh had, Dr. Hanna stated that such a process cannot be treated unless the physician knows what it is, and in Bugh's case this was not determined.  Patients are otherwise provided supportive care, like good nutrition and vitamin supplementation, or a procedure like the plication Bugh received in 2017 to better ventilate them, according to Dr. Hanna.

{¶50} Thomas John Parker, M.D. testified as an expert witness for defendant. Dr. Parker is board certified in internal medicine, pulmonary medicine, and critical care medicine, and is licensed to practice medicine in Ohio, Indiana, and Kentucky, he stated, and he recounted his education, training, and professional experience, including research and publications.  As Dr. Parker described, early in his career he practiced primary care for several years but since 1990 he has worked primarily in the areas of pulmonary and critical care, the latter of which involves overseeing intensive care patients.  Dr. Parker works for OhioHealth providing pulmonary telehealth consults to most of the hospitals in its system as part of his professional work, and part of the time he cares for about 150 intensive care patients, and he also provides telehealth consults to VA hospitals all over the eastern half of the country and teaches VA residents, he stated.

{¶51} Dr. Parker testified that he has seen well over 100 patients with diaphragmatic weakness and phrenic nerve issues, most commonly patients who develop such problems after open heart or shoulder surgery. There are left and right phrenic nerves that start in the cervical spine area, getting contributions from the C-3 to C-5 cervical nerves, and running down to the diaphragm, Dr. Parker explained. The cervical nerves are primarily responsible for sensation and function of the upper extremities, according to Dr. Parker. As he explained, the brain signals to the nerves that the body needs to breathe, and this signal goes through the phrenic nerves and to the diaphragm.

{¶52} There are various causes of diaphragmatic weakness, Dr. Parker explained, including neuropathic processes and myopathic processes, but in most cases that do not result from open heart or shoulder surgery the causes are idiopathic. A neuropathic process is a nerve problem, which for diaphragmatic weakness may be a problem anywhere along the phrenic nerve, Dr. Parker stated. For patients presenting with diaphragmatic weakness, Dr. Parker described how sniff testing, under fluoroscopy, enables a radiologist to see how much, if at all, the diaphragm moves, and EMG testing enables a neurologist to measure reaction in a muscle from stimulating a nerve. If there are symptoms suggesting a nerve condition, an MRI of the spine may be ordered, Dr. Parker stated. Dr. Parker also described how CT imaging of the chest may be performed to see if a tumor is pushing on the phrenic nerve, and bloodwork may be performed to look for diseases affecting the muscles such as lupus, vitamin deficiencies, or myopathy from an infectious illness. Asked about a standing MRI device, Dr. Parker testified that no patient of his has ever used one and he is not aware of any hospital that has one, whether in the OhioHealth or VA hospital systems or elsewhere. A patient with unilateral diaphragmatic weakness may use a bi-pap machine to assist with breathing as needed, but normally is not otherwise treated according to Dr. Parker.

{¶53} Dr. Parker explained how COPD begins as inflammation of the bronchial tubes and leads to emphysema when the inflammation spreads to the air sacs and destroys them. According to Dr. Parker, Bugh had both conditions as demonstrated by his being prescribed albuterol to treat the bronchial condition and by chest scans at the VA which showed emphysema in his lungs. Cigarette smoking is by far the most common

cause of COPD, which primarily manifests in a cough, while emphysema primarily manifests in shortness of breath, Dr. Parker related.

{¶54} Dr. Parker testified that he makes referrals to other physicians working in various specialties, sometimes seeking a diagnosis, and other times when he may know the diagnosis he seeks help in treating the patient. It is customary that the specialist provides a report to the referring physician after doing a full workup, Dr. Parker stated, and when he receives such reports he reviews them to see if there is anything that he needs to facilitate or assist with, but generally for a primary care doctor there is not much to do. Dr. Parker explained that it is standard that the specialist is expected to take over management of the patient for the problem for which they were referred.

{¶55} Speaking about how the providers at GCI came to refer Bugh to OSUWMC in 2008 for shortness of breath and left diaphragmatic weakness, Dr. Parker testified that this was appropriate, as he would not expect a primary care provider to have the expertise to evaluate Bugh's problems, while OSUWMC has a positive reputation for taking referrals and in his own practice patients are referred there. Dr. Parker discussed the pulmonary workup that Dr. O'Brien performed at OSUWMC, including finding that Bugh may have had COPD and vocal cord dysfunction and making a referral to an ENT who confirmed a vocal cord problem, and how Dr. O'Brien prescribed exercises and speech therapy. Dr. Parker opined that it was reasonable for the providers at GCI to rely on Dr. O'Brien and other specialists at OSUWMC.

{¶56} There was then a period from 2009 to 2011 in which Bugh had no recorded pulmonary complaints, Dr. Parker recalled. But in 2011 Bugh was hospitalized at OSUWMC, placed on a ventilator, and underwent extensive testing, Dr. Parker stated, and it was thought, following the results of a muscle biopsy, that Bugh had myositis, but it was not a specific treatable diagnosis. Dr. Parker described further care that Bugh received from specialists at OSUWMC, the significance of some of their findings, and the differential diagnoses that were being considered as potential causes.

{¶57} Regarding the recommendation from OSUWMC that Bugh undergo an MRI of the cervical spine, Dr. Hoaglan's subsequent request for the same, and Bugh's refusal to go through with it if it required intubation, Dr. Parker stated that it was reasonable for Dr. Hoaglan to follow that recommendation and pursue an MRI, but that a physician's role

is to make recommendations and patients can make their own decisions about all their medical care; he has had patients of his own who refused to undergo tests. Dr. Parker also testified that it would have been up to OSUWMC to determine how to accomplish the MRI. Dr. Parker further stated that he is not aware of a standing MRI machine, and that while there exists today an MRI machine that is compatible with a patient using a bi-pap machine, this kind of machine did not become available until about 2016 to 2017. Dr. Parker also noted that an MRI was requested not only for the cervical spine, but at one point it was also recommended for the brain, and it is unknown whether a cervical spine MRI would have diagnosed anything.

{¶58} In Dr. Parker's opinion, Bugh had multiple conditions that affected his breathing. Dr. Parker stated that Bugh had COPD and emphysema, and that while albuterol was used to treat his COPD, emphysema is not treatable, as it entails permanent damage to the lungs. Dr. Parker stated that Bugh also had sleep apnea, which can cause shortness of breath, and this was treated initially with a c-pap machine and later with a bi-pap machine. Dr. Parker additionally stated that Bugh had left diaphragmatic weakness and later some on the right side, and in Dr. Parker's opinion the weakness was the result of a myopathic process, the cause of which was never determined. Dr. Parker explained that when Dr. O'Brien measured Bugh's air pressure when breathing in and breathing out, the weakness found while breathing in fit with diaphragmatic weakness, but because the abdominal muscles control breathing out, the weakness found when Bugh breathed out fit with a myopathic problem. Dr. Parker added that, from a neurological standpoint, the abdominal muscles are not controlled by the cervical spine like the diaphragm and are instead controlled by the thoracic spine. And Dr. Parker explained how testing later performed at the VA showed improvement in both the diaphragm and abdominal muscles, which is further evidence that there was a myopathic process involved. Dr. Parker agreed with the conclusion reached at OSUWMC that Bugh had myositis, and he opined that it was appropriate for Dr. Hoaglan to rely on that diagnosis and follow the recommended treatment plan.

{¶59} Overall, Dr. Parker opined that OSUWMC was well positioned to be able to care for patients with muscle and nerve problems and there was never a reason to send

Bugh anywhere else for care and treatment. Dr. Parker felt that Dr. Hoaglan and defendant's other medical providers met the standard of care.

{¶60} Dr. Parker testified that, in his opinion, Bugh's breathing problems did not result from cervical spine trauma associated with his motor vehicle accidents in the 1980s because the MRI obtained at the VA hospital did not show a herniated disc or bone spurs or other trauma that would compress the nerve roots, and instead he saw only bulging and narrowing that would be typical of normal wear and tear. Consistent with that, according to Dr. Parker an operation on the cervical spine in 2012 would not have improved Bugh's quality of life, and such a procedure would have associated risks, including damage to other nerves that may leave the patient with weakness or numbness in the arms.

{¶61} Dr. Parker's opinion was that the diaphragmatic weakness improved on its own, bearing out that the earlier plan to wait and monitor Bugh was the correct plan of care. Interpreting the 2014 VA records from Dr. Ansari, in his view they demonstrate that the myopathy was no longer present, i.e. there was no muscle inflammation, but the muscle had not yet regained full strength. To the extent Dr. Ansari was unable to detect a phrenic nerve response during EMG testing, Dr. Parker explained that the EMG is a difficult test to perform and does not take into account the patient's clinical picture, which in this instance was that Bugh was still breathing, and since he was still breathing, he necessarily had some phrenic nerve function.

{¶62} Dr. Parker stated that the VA records from Dr. Onders in 2017 show that, by that time, the right side had regained strength such that it was almost back to normal and the left side had regained some function. But according to Dr. Parker, while the breathing would be expected to improve in connection with the resolution of Bugh's myopathy, Bugh's COPD would be expected to worsen over time, with the net effect being that he would still have breathing problems. Dr. Parker noted that a 2015 CT scan at the VA showed emphysema, while another taken several years earlier did not, and bloodwork done in 2017 showed a carbon monoxide level consistent with smoking at least a pack a day of cigarettes, meaning that Bugh was probably still smoking.

{¶63} Andrew David Eddy, M.D. testified that in January 2011 he became defendant's Chief Medical Officer, responsible for overseeing and implementing clinical

healthcare at all of defendant's correctional institutions.  Dr. Eddy, who is board-certified in internal medicine and licensed to practice in Ohio, went over his educational and professional background, including having obtained his medical degree in 1984 and serving in several medical roles, including as an emergency physician, as medical director of the Ohio Department of Developmental Disabilities, and as chief medical officer at Noble Correctional Institution.  Each of defendant's correctional institutions has a chief medical officer, and when he held that title at Noble Correctional Institution his responsibilities were like those of Dr. Hoaglan at GCI.

{¶64} Describing his duties, Dr. Eddy stated that, at least before the COVID-19 pandemic, he would make regular visits to the correctional institutions to conduct peer reviews and to meet with physicians and other clinical staff to review policies and any problems they were having.  Dr. Eddy stated that when the providers at the correctional institutions make consultation requests, he and the chief medical officer at the institution have a weekly collegial review of such requests for the purposes of managing resources and assessing ongoing care.  Once they jointly decide on a plan at the collegial review stage, Dr. Eddy testified, the chief medical officer at the institution would be responsible for documenting that in the inmate's medical records.

{¶65} Defendant has a contract with OSUWMC to provide tertiary care and specialty services, Dr. Eddy explained, and under this arrangement inmates with approved consultation requests are sent there for specialty clinics or diagnostic work.  He also explained that defendant provides some specialty care at its own Franklin Medical Center, but OSUWMC offers more complex care.  Inmates are also transported there sometimes from the local emergency rooms where correctional institutions may send inmates for acute needs, according to Dr. Eddy.  When inmates are at OSUWMC, the providers there treat the inmates as they see fit so long as they have the inmate's consent, Dr. Eddy stated.

{¶66} Dr. Eddy related that he reviewed Bugh's medical records and was familiar with his care, summarizing that he understood Bugh had issues with a paralyzed diaphragm and shortness of breath when lying down, and there was difficulty obtaining a diagnosis at least in part because Bugh refused to be intubated for an MRI as had been recommended by OSUWMC, since he would have difficulty breathing on his own when

lying flat for the MRI. Dr. Eddy explained that an on-site provider like Dr. Hoaglan would be expected to discuss this sort of recommended care with the inmate-patient, but like any other patient an inmate has the right to refuse care, unless they are incapacitated.

{¶67} Dr. Eddy recalled that OSUWMC and defendant's providers recommended multiple times that Bugh undergo an MRI for purposes of investigating any phrenic nerve issues, and he recalled discussing Bugh's care with Dr. Hoaglan several times because they were trying to figure out if there was a way to obtain the MRI that would be agreeable to Bugh. According to Dr. Eddy, he had some direct communication with one or more physicians at OSUWMC about the matter and investigated what capability they had. OSUWMC did not have a standing MRI machine, Dr. Eddy stated, nor did he know of any facilities that had one, but if there was such a facility the providers at OSUWMC could have referred Bugh there if they felt it was indicated. Indeed, when defendant requests an MRI consultation, the final determination of what kind of diagnostic study will be performed is up to the provider in charge of the radiology suite at OSUWMC. Regardless, a standing MRI machine would produce an image that would be too poor for making a diagnosis, according to Dr. Eddy. Dr. Eddy stated that he and Dr. Hoaglan also discussed the possibility of Bugh undergoing an MRI with long tubing attached to his bi-pap machine, but as far as he could recall OSUWMC did not have the capability to do so at that time.

{¶68} Dr. Eddy acknowledged that there was no definitive diagnosis made as to the cause or causes of Bugh's diaphragmatic weakness, and that if Bugh had myopathy, the nature and cause of the myopathy were not determined. But Dr. Eddy testified that defendant's responsibility to the patient was shared in consultation with the neurology clinicians at OSUWMC, who are the experts, and defendant would defer to and rely upon their expertise concerning the cause, nature, and treatment of the myopathy.

{¶69} Todd Hoaglan, M.D. testified that he is now the Chief Medical Officer at Lorain Correctional Institution, which is adjacent to GCI, where he previously served as Chief Medical Officer beginning in late 2010. Dr. Hoaglan summarized his educational and professional background and stated that he is board-certified in family practice and licensed to practice medicine in Ohio.

{¶70} At GCI, Dr. Hoaglan spent 80 to 85 percent of his time seeing patients while also performing some administrative responsibilities, he stated, and there were two nurse

practitioners working under him and occasionally another doctor. He and the other providers at GCI would provide the diagnosis, care, and treatment that they could handle locally, but if an issue was beyond his training he would refer to an outside specialist as indicated, he stated. Dr. Hoaglan explained that some imaging and less sophisticated referrals could be accomplished at Franklin Medical Center, and emergent care could be referred to a local emergency room, but otherwise inmates were referred to OSUWMC pursuant to its contract with defendant.

{¶71} Dr. Hoaglan discussed Bugh's medical history, which he characterized as complex, and identified several aspects of that history which he would have known about during the time when he cared for Bugh, including Bugh being a smoker, and having prostate issues, a history of motor vehicle accidents, left-sided diaphragmatic weakness that was diagnosed before he began working at GCI, and shortness of breath. Dr. Hoaglan also discussed the circumstances by which he came to refer Bugh to OSUWMC several times. In general, Dr. Hoaglan stated, he refers patients to OSUWMC because he wants to know the best way forward for a patient's treatment. Referrals at that time were submitted for collegial review, where they would be discussed with Dr. Eddy or another colleague, Dr. Hoaglan recalled, and he believed that everything he requested for Bugh was approved in the collegial review process.

{¶72} After initially referring Bugh to OSUWMC for increasing shortness of breath, Dr. Hoaglan stated, he continued making referrals to several departments there as the specialists would recommend things, and he would review their reports and rely on their recommendations and refer Bugh for whatever they recommended, or if the specialist just recommended treatment that could be carried out at GCI, he would follow that recommendation. Dr. Hoaglan, who allowed that he could be viewed as Bugh's primary care physician, testified that OSUWMC is a world class facility and a specialist there such as a pulmonologist or neurologist would know more about their areas of medicine than he would. The providers at OSUWMC were trying to diagnose the exact cause of Bugh's complaints in order to know how to treat him, Dr. Hoaglan stated.

{¶73} Dr. Hoaglan discussed several of the orders that he made for Bugh's care to investigate various potential causes of his symptoms. One of those, Dr. Hoaglan stated, was a January 26, 2012 order for an MRI of the brain, cervical spine, and brachial plexus,

but as documented in a Release of Responsibility form dated February 27, 2012, Bugh declined to undergo the MRI. (*Id.*, p. 000467.) The Release of Responsibility form is routinely given to inmates for signature when they refuse medical treatment, Dr. Hoaglan testified. Inmates who are scheduled to travel to OSUWMC are called down early in the morning to board a bus, and if they refuse to make the trip the nurse on duty customarily explains the dangers of not going ahead with the treatment and has the inmate sign the form, according to Dr. Hoaglan. He stated that he would then ordinarily follow up with the patient and try to explain how, if the inmate does not go through with the recommended care or treatment, he may not be able to help treat or diagnose them and the inmate may face a long-term problem or even death, and he further stated that he generally tries to find an alternative method of care or treatment, if possible. Dr. Hoaglan explained that OSUWMC had recommended that Bugh be intubated for his MRI in light of the difficulty he would have breathing when lying down, but Bugh felt that he should not be intubated, citing a past experience with intubation at Elyria Memorial Hospital. Yet, Dr. Hoaglan stated, Bugh had been intubated during his 2011 hospitalization at OSUWMC. In Dr. Hoaglan's experience, Bugh was a difficult, cantankerous patient.

{¶74} Dr. Hoaglan explained that it was known Bugh already had hemiparesis on the left side of the diaphragm, but in 2012 he and the providers at OSUWMC were trying to determine if Bugh was also developing a problem with the right side of the diaphragm, and the MRI was sought to investigate that. In Spring 2012, Dr. Hoaglan stated, he made another consultation request expressing concern about the right diaphragm and asking the OSUWMC radiology department how to accomplish the studies that he had previously sought, being an MRI of the brain, cervical spine, and brachial plexus. (*Id.* at p. 000450.) According to Dr. Hoaglan, he thought at first that OSUWMC would be able to perform the MRI with Bugh using his bi-pap machine, so he mentioned it in his consultation request, but the radiology department responded back that this was not possible. Dr. Hoaglan stated that in Fall 2012 he made another consultation request, still trying to find a way to get the diagnostic imaging, this time stating that Bugh would need a "standing MRI", which at the time he thought OSUWMC might be able to perform, or long tubing for his bi-pap machine. (*Id.* at p. 000420.) But, Dr. Hoaglan stated, he came to learn that there was no standing MRI available, nor was there an option to use long tubing with the bi-pap

machine. Dr. Hoaglan stated that he does not know of a standing MRI machine anywhere in the state of Ohio, and even if one existed it would basically be an "open MRI", which does not produce good images for diagnostic purposes and probably would not have sufficed in this instance.

{¶75} Dr. Hoaglan recounted that with OSUWMC maintaining that intubation—which Bugh still refused—was the only way to accomplish an MRI, he continued trying to find out what was going on with Bugh so that he could be treated, and in December 2012 he made a consultation request to the neurology department at OSUWMC to see if there were any other diagnostic options or to otherwise determine a path forward. (*Id.* at p. 000441.) Dr. Hoaglan's recollection was that, as a result, he and Dr. Eddy communicated with the head of the neurology department and subsequently arranged for additional consultation for Bugh. But, Dr. Hoaglan stated, Bugh refused to attend a neurological consult on March 14, 2013, "due to cold weather", and again on November 8, 2013, Bugh refused a trip for EMG testing and analysis of phrenic nerve paralysis due to cold weather. (*Id.* at pp. 000650, 000660.) Dr. Hoaglan read his progress notes from a July 26, 2013 visit with Bugh in which he noted the difficulty in obtaining a neurology workup for Bugh because he would not be intubated, and Dr. Hoaglan stated that he would have again counseled Bugh why he should not refuse testing. (*Id.* at p. 000647.) Dr. Hoaglan recounted that Bugh refused tests many times and it was the custom of the nursing staff to counsel him each time, and for Dr. Hoaglan to counsel Bugh afterward each time. But Dr. Hoaglan stated that as late as August 20, 2014, not long before his release from defendant's custody, Bugh continued to refuse care, this time a trip outside GCI to undergo an EMG test that he refused because he was not allowed to wear "soft restraints" during the trip. (*Id.* at p. 000657.)

{¶76} By the time Bugh left prison, and in light of the diagnostic testing that he refused, the specialists at OSUWMC were not able to come up with a good diagnosis as to the cause of Bugh's diaphragmatic paralysis, Dr. Hoaglan summarized. Over the course of Bugh's several consults at OSUWMC, though, the specialists there had recommended several forms of treatment for his breathing problems, including albuterol, the bi-pap machine, and vocal cord exercises, Dr. Hoaglan stated, and he concurred that those were the best treatments that could be offered based on the available evidence.

Dr. Hoaglan testified that the providers to whom Bugh was referred at OSUWMC are the specialists in their fields and he follows what they tell him, and in Bugh's case OSUWMC never recommended anything that defendant's medical professionals rejected or did not follow.  When Bugh left GCI, Dr. Hoaglan stated, he probably recommended to Bugh that he follow up with a primary care physician to direct his care like he had.  Dr. Hoaglan acknowledged that Bugh complained through 2014 of worsening shortness of breath, but he also stated that every time he saw Bugh in his office Bugh spoke in full sentences and did not seem short of breath.

{¶77} Dr. Hoaglan disagreed with any suggestion that he was not aggressive enough in caring for Bugh, as he felt referrals to specialists across multiple disciplines were accomplished quickly, and he explained that defendant's providers can access the specialists at OSUWMC more quickly than what is typical in the medical field.  In Dr. Hoaglan's view, he appropriately relied on and followed all the recommendations from OSUWMC, and when Bugh refused to go through with recommended care he appropriately counseled Bugh in his customary way, trying to explain everything in layman's terms and laying out the consequences.  Bugh's breathing problems were not a run of the mill problem, but a complex case, Dr. Hoaglan explained, as demonstrated by the specialists being unable to determine a cause, and in his role it cannot be expected that he would determine a cause when the specialists could not.

{¶78} Dr. Hoaglan had no recollection of Bugh ever asking to be referred to the VA instead of OSUWMC.  Regardless, he stated, inmates do not have the option to transfer their care to the VA; in general, their care must be provided by defendant or OSUWMC.

**Analysis**

{¶79} Plaintiff's claim is based upon a theory of medical malpractice.  "In order to establish medical malpractice, a plaintiff must show: (1) the standard of care recognized by the medical community, (2) the failure of the defendant to meet the requisite standard of care, and (3) a direct causal connection between the medically negligent act and the injury sustained."  *Tobin v. Univ. Hosp. E.*, 2015-Ohio-3903, ¶ 14 (10th Dist.), citing *Stanley v. Ohio State Univ. Med. Ctr.*, 2013-Ohio-5140, ¶ 19 (10th Dist.).  "Expert testimony is required to establish the standard of care and to demonstrate the defendant's

alleged failure to conform to that standard." *Reeves v. Healy*, 2011-Ohio-1487, ¶ 38 (10th Dist.), citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-131 (1976). The Supreme Court of Ohio established the legal standard for medical malpractice in *Bruni*:

{¶80} "In evaluating the conduct of a physician and surgeon charged with malpractice, the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations." *Id.* at 129-130.

{¶81} Upon review of the evidence presented at trial, the magistrate finds as follows. In 1989, Bugh, then 38 years old, began serving a 25-year prison sentence in defendant's custody. Bugh, who was a heavy smoker and had been seriously injured in two motor vehicle accidents in the 1980s, experienced a number of medical problems as he served out his sentence and got older, including heart problems and stent placement, enlarged prostate, back pain for which he received injections and wore a TENS unit, and arthritis in several places throughout his body and for which he needed special orthotic footwear.

{¶82} In 2008 Bugh complained to the medical professionals at GCI that he was experiencing shortness of breath. Bugh was referred to OSUWMC, where he saw Dr. O'Brien in the pulmonology clinic and continued to receive care into 2009. Testing indicated that Bugh had left diaphragmatic paralysis. Dr. O'Brien felt that Bugh's symptoms were not typical of hemi diaphragmatic paralysis, though, and he eventually determined that vocal cord dysfunction was likely involved in Bugh's symptoms. Bugh was prescribed breathing exercises to address the vocal cord abnormality. Bugh's symptoms improved and for approximately two years between 2009 and 2011 he did not require further attention for breathing problems.

{¶83} In 2010 Dr. Hoaglan became the Chief Medical Officer at GCI and began seeing Bugh, essentially serving as his primary care physician. In Fall 2011 Bugh

renewed his complaints of breathing problems, and he particularly had difficulty breathing when lying down.  Dr. Hoaglan made a referral to OSUWMC, but before being seen there Bugh experienced acute symptoms that resulted in GCI having him transported to the local emergency room at Elyria Memorial Hospital and then flown by helicopter to OSUWMC, where he was hospitalized on or about October 11 to 29, 2011.  During that time at OSUWMC, Bugh was seen by several specialists across multiple practice areas.  Among other issues, the providers there found that Bugh had some diaphragmatic paralysis on the right side in addition to the left-sided diaphragmatic paralysis first observed in 2008, and he had scapular winging on the right side.  The neurology department at OSUWMC performed EMG testing and a muscle biopsy and felt that Bugh's symptoms were probably related to a myopathic or muscular disease.  To treat the breathing difficulty Bugh had when lying down, OSUWMC prescribed a bi-pap machine for breathing assistance, and he used the machine upon returning to GCI.

{¶84} Dr. Hoaglan continued caring for Bugh when he returned to GCI and Dr. Hoaglan timely and consistently followed the recommendations of the specialists at OSUWMC.  When Bugh was discharged from his hospitalization at OSUWMC, it had been recommended that he follow up with a neurology consultation there and Dr. Hoaglan consequently arranged for the same.  On January 10, 2012, a neurologist at OSUWMC evaluated Bugh and identified several potential etiologies for Bugh's symptoms, including post traumatic, infectious, inflammatory, demyelinating process, paraneoplastic, and malignancy, and among the diagnostic steps that he recommended was a recommendation that Bugh undergo an MRI.

{¶85} After this evaluation with the neurology department at OSUWMC, Dr. Hoaglan followed the neurologist's recommendation and on or about January 26, 2012, he ordered a brain MRI, cervical spine MRI, and brachial plexus MRI for Bugh.  But when it came time for Bugh to travel to OSUWMC to undergo the MRI, on February 27, 2012, he declined to do so, as documented in a Release of Responsibility form that he signed.  Bugh refused to go through with an MRI because he would need to be intubated when lying down in the MRI machine (due to the difficulty he had breathing when lying down) and he did not want to be intubated.  As documented in the Release of Responsibility form, Bugh did so against medical advice and was informed of the risks involved.  A nurse

would have explained to Bugh at the time the risks of his decision, and Dr. Hoaglan subsequently discussed the matter with Bugh, explaining to him the importance of going through with the MRI under intubation as recommended by the specialists at OSUWMC, and that Bugh's providers might not be able to treat or diagnose him if he would not agree to the testing, which could lead to serious harm or even death. But Bugh would not agree to undergo the MRI under intubation.

{¶86} Dr. Hoaglan and defendant's Chief Medical Officer, Dr. Eddy, explored any alternatives, including trying to arrange for the MRIs to be done in a "standing" MRI machine or with long tubing connected to Bugh's bi-pap machine. But these methods were not available. OSUWMC did not have a standing MRI machine, nor was it shown that such a machine was available anywhere in the state of Ohio; even if it had been shown that such a machine was available somewhere, the imaging more likely than not would have been inadequate for diagnostic purposes. And during the relevant time period, MRIs were not able to be performed with a bi-pap machine. Thus, the only way for Bugh to safely undergo the MRIs was to be intubated, but during the rest of his time in defendant's custody he would not agree to be intubated.

{¶87} In light of Bugh's refusal to be intubated, in December 2012 Dr. Hoaglan requested that Bugh have a consultation with the OSUWMC neurology department to explore any alternative diagnostic options or otherwise determine a path forward. After some communication with Dr. Eddy—the leader of defendant's medical department—and the leadership of the OSUWMC neurology department, Bugh was scheduled for a neurology evaluation on March 14, 2013, but he refused to go to OSUWMC that day because the weather was cold. Similarly, Dr. Hoaglan arranged for Bugh to undergo EMG testing and analysis of phrenic nerve paralysis on November 8, 2013, but he again refused to go because of cold weather. Dr. Hoaglan persisted in trying to obtain a neurology workup for Bugh, but up to the end of his time in prison Bugh continued refusing care, including EMG testing he was scheduled to undergo on August 20, 2014, which he refused because he took exception with the type of restraints that he was to be transported in that day.

{¶88} Dr. Hoaglan, as a primary care physician at GCI, relied on the expertise of the specialists at OSUWMC to diagnose Bugh and determine a course of treatment. In

light of Bugh's repeated refusals to undergo diagnostic testing recommended by the specialists at OSUWMC and by Dr. Hoaglan, the specialists were not able to determine a diagnosis as to the cause of his breathing problems. But based on the recommendations from the specialists at OSUWMC using the information available to them notwithstanding the testing refused by Bugh, and through the care coordinated by defendant, Bugh received appropriate treatment for his breathing problems that included albuterol, a bi-pap machine, and breathing exercises.

{¶89} Upon his release from prison on November 14, 2014, Bugh went to a VA hospital to obtain a bi-pap machine, and he continued treating with the VA thereafter. Bugh received EMG testing from Dr. Ansari at the VA which detected no response in the phrenic nerves, but the fact that Bugh was able to breathe without intubation meant that he necessarily had some phrenic nerve function, meaning that the EMG test did not produce an accurate result. In 2017, Bugh finally agreed to undergo a cervical spine MRI under intubation which showed narrowing in the cervical spine column that had not previously been known, nor could it have been known because of Bugh's earlier refusals to undergo an MRI under intubation. The VA providers referred Bugh to Dr. Onders who performed plication surgery in 2017 that provided minimal relief. Still, by 2017 Bugh's breathing showed some improvement, and Dr. Onders observed that the diaphragmatic weakness had diminished, particularly on the right side. But Bugh, then in his 60s, was smoking cigarettes and had several health issues that limited his physical abilities, although he was able to engage in some home improvement work and other modest physical activity. Bugh was diagnosed with lung cancer in 2019 and died as a result in 2020.

{¶90} Plaintiff did not establish that defendant's medical professionals failed to meet the requisite standard of care.

{¶91} According to plaintiff, citing Dr. Thomas's testimony, defendant's medical professionals "deviated from the standard of care in failing to diagnose the neurological problem when Mr. Bugh re-presented in 2011 with the right winged scapula and right diaphragmatic compromise." (Plaintiff's Brief, p. 10.) Plaintiff further argues that "[w]hen right sided problems developed in 2011, the diagnosis should have been clear." (*Id.* at p. 19).

{¶92} But when Bugh began complaining of breathing difficulty again in 2011, Dr. Hoaglan promptly and appropriately referred Bugh to specialists at OSUWMC, and after Bugh's hospitalization at OSUWMC Dr. Hoaglan followed the specialists' recommendations, including the use of the bi-pap machine and arranging for additional neurological consultation at OSUWMC. Dr. Hoaglan, a general practitioner, appropriately relied on the experts at OSUWMC for diagnosis and treatment of Bugh's breathing problems and diaphragmatic paralysis.

{¶93} There were several potential causes for Bugh's symptoms, and to investigate potential causes the specialists at OSUWMC made certain recommendations, including, among other things, that Bugh undergo an MRI for diagnostic imaging of his brain, brachial plexus, and cervical spine. Although Dr. Thomas felt that spinal cord compression was never considered as a cause of Bugh's problems and Dr. Pineless similarly opined that Bugh's providers overlooked the cervical spine as a potential cause, Dr. Hafeez at OSUWMC considered the potential for a "post traumatic" etiology of Bugh's problems, and among the diagnostic measures that were ordered by Dr. Hoaglan was an MRI of Bugh's cervical spine. But Bugh refused to undergo an MRI because he would need to be intubated for the procedure and he did not want to be intubated. Though Dr. Hoaglan and Dr. Eddy explored other potential means of obtaining an MRI, from the evidence adduced at trial there simply was no alternative to Bugh being intubated for the procedure.

{¶94} Bugh never underwent the MRI while in defendant's custody because he refused to do so, despite multiple providers, including Dr. Hoaglan and the neurology department at OSUWMC, recommending that he go through with the procedure, and despite being appropriately counseled by defendant's medical professionals as to the importance of receiving this recommended care, as established through Dr. Hoaglan's credible testimony and the documentation Bugh signed to acknowledge his refusal of care. Bugh's refusals to undergo MRI and other testing stymied the efforts of the providers at defendant and OSUWMC to investigate the potential causes of his breathing problems and diaphragmatic paralysis.

{¶95} Plaintiff argues that "Dr. Houghlan and DRC breached the standard of care when they gave up on Mr. Bugh's diagnosis and treatment in 2012." (Plaintiff's Brief, p.

20.)   To the contrary, it is apparent that Dr. Hoaglan and defendant's other medical professionals continued to coordinate diagnosis and treatment options for Bugh until he left defendant's custody, despite Bugh repeatedly refusing the care that was arranged or recommended for him.    Simply put, the greater weight of the evidence shows that Dr. Hoaglan did what was required of him as Bugh's general practitioner, coordinating his care and pursuing diagnostic and treatment options from the time he presented with renewed breathing complaints in 2011 up through his release from custody in 2014.

{¶96} For the sake of argument, even if defendant's medical providers had somehow fallen below the standard of care in connection with not obtaining a cervical spine MRI, any such negligence would have been outweighed by Bugh's negligence in refusing to be intubated for the procedure as recommended by the providers at OSUWMC and GCI.   Furthermore, even if a cervical spine MRI had been obtained, and even if it were assumed that the MRI would have shown narrowing of the spine, it was not shown that a laminectomy would have been indicated in 2011 or 2012 and provided relief like plaintiff claims.   Bugh's case was complex and it is more likely than not that his breathing problems had several causes.   The fact that Bugh's right-sided diaphragmatic weakness was substantially resolved by 2017 illustrates that, even if his breathing problems partly had a neurological cause, it was not the only cause and surgery would not have produced a better outcome for Bugh since the diaphragm improved without surgery.   Bugh's problems were probably caused, in part, by his history of smoking.   Dr. Parker also illustrated how there was likely a myopathic issue involved, pointing to how Bugh had difficulty breathing out, not just breathing in, according to pulmonary function tests performed by Dr. O'Brien at OSUWMC, which meant that Bugh's abdominal muscles were weak too, and those muscles were controlled by the thoracic spine.

{¶97} Plaintiff and his experts point to an October 7, 2008 letter from a physician at OSUWMC, Dr. Carole Miller, in which she sought a lumbar spine MRI for Bugh. (Exhibit 1, p. 001040.)   According to plaintiff, Dr. Miller sought a cervical spine MRI in this letter "to determine whether there was a neurological cause for the diaphragmatic paralysis from which Mr. Bugh was suffering" but "[t]here is nothing in the record to indicate whether Mr. Bugh was given a cervical MRI in 2008." (Plaintiff's Brief, p. 4.)   But this misrepresents Dr. Miller's letter, which provides that she saw Bugh for a herniated

lumbar disk and wanted not a cervical spine MRI, but a lumbar spine MRI, which was not shown to be relevant to the care at issue in this case.

{¶98} Additionally, there is no dispute that among the records defendant produced to plaintiff in this matter was the report of a cervical spine MRI performed on another inmate on October 14, 2008. Plaintiff's experts initially thought the record belonged to Bugh and relied on it in forming their opinions on the case, but Dr. Pineless later discovered the error, requiring both he and Dr. Thomas to revise their opinions. Plaintiff criticizes defendant for erroneously producing another inmate's MRI report, and more generally criticizes the overall recordkeeping and organization of defendant's medical providers, but neither the erroneously produced report nor the state of Bugh's medical records were shown to have any bearing on the ultimate outcome of the case. Relatedly, though, the fact that plaintiff's experts relied on an irrelevant medical record obviously belonging to another inmate, and relied on an apparently non-existent 2008 EMG report, calls into question their review of the matter.

{¶99} And, upon careful consideration of the expert testimony presented in this case, the testimony of defendant's experts carried more weight. Drs. Hanna and Parker had far greater experience working with patients with diaphragmatic weakness and phrenic nerve issues than plaintiff's experts and articulated more authoritative and persuasive explanations of the issues in the case.

{¶100} In the final analysis, plaintiff did not meet the burden of proving that the diagnosis, care, or treatment rendered by defendant's medical professionals fell below the standard of care.

{¶101} Based on the foregoing, the magistrate finds that plaintiff did not prove his claim by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶102} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding*

*of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
ROBERT VAN SCHOYCK
Magistrate

**Filed June 26, 2024**
**Sent to S.C. Reporter 7/18/24**